237 F.2d 448
 Phillip Cilbert GAY, as Executor of the Estate of P.W. Gay,
Deceased, Appellant,
v.
The PACIFIC MUTUAL LIFE INSURANCE COMPANY, also known as The
Pacific Mutual Life Insurance Company of
California, Appellee.
 No. 16113.
 United States Court of Appeals Fifth Circuit.
 Oct. 16, 1956.
 
 Erle Pettus, Jr., J. K. Jackson, Birmingham, Ala., for appellant. Jackson, Rives, Pettus & Peterson, Birmingham, Ala., of counsel.
 Ralph B. Tate, S. R. Starnes, Birmingham, Ala., for appellee. Spain, Gillon & Young, Birmingham, Ala., of counsel.
 Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 In an action on a $5,000 accident insurance policy on the life of Mrs. Tenzy L. Gay, the district court directed a verdict for the defendant. The policy provided:
 
 
 2
 'The Pacific Mutual Life Insurance Company of California Does Hereby Insure Tenzy L. Gay under Classification 'A' by occupation a Housewife against loss resulting directly and independently of all other causes from bodily injuries sustained during the term of this Policy and effected solely through accidental means, subject to the provisions, conditions and limitations hereincontained * * *' (Emphasis supplied.)
 
 
 3
 Early on the morning of February 22, 1955, a sister of Mrs. Gay discovered her lying on the floor in her bedroom.[1] The physician summoned was of the opinion that she had been dead for several hours. On the next day, when he had the 'gross findings' but not the 'chemical studies' of an autopsy made at his request, the physician signed the certificate of death required by Alabama Law,[2] stating the cause of death as follows:
 
 
 4
 "Disease or Condition Interval Between
 Directly Leading to Onset and Death
 Death
 'Coma. precise cause
 undetermined' '4 hours'
"Antecedent Causes
 Due to 'Alcoholism, acute' '9 hours'
 'Possible superimposed
 accidental barbiturates
 overdose' '4-8 hours'
"Accident, Suicide,
 Homicide 'Accident'
"How Did Injury Occur? ' Accidental overindulgence
 in alcohol and
 possibly barbiturates."
 
 
 5
 The autopsy report thereafter completed disclosed .26 per cent ethyl alcohol in the blood. The toxicologist was unable to detect barbiturates but did not consider that the negative results necessarily indicated that barbiturates were not involved in the death, stating:
 
 
 6
 'We are confident that our technique is capable of detecting barbiturates in quantities sufficient to be toxic when they are acting alone, but the synergistic effect of alcohol appears, from the history of the cases that have come to our attention, to increase the effect of the combination to such an extent that the barbiturates are frequently present only in small quantities and are not detectable by methods we have available at this office. We are not even certain that the technique is at fault; we suspect that possibly the prior impairment of body functions by barbiturates may be responsible for death occurring with considerably less than the usual fatal quantity of alcohol.'The physician testified that the decrease in alcoholic content of the body after death was extremely slow; that the percentage of alcohol in the blood required to produce death varied from .4% to .8%, so that the .26% disclosed by the autopsy was not by itself fatal; that barbiturates and alcohol both tend to depress the higher nerve centers, and each makes the other more effective, so that taken together their actions synchronize and produce a greater effect than can be accounted for by a mere summation of depressant effects.
 
 
 7
 For some time just prior to her death Mrs. Gay had been in the habit of resorting to the use of both alcohol and barbiturates. Upon retiring, she customarily took from her medicine cabinet, for easy availability, a pinkish sleep inducing capsule containing seconal, a quick acting barbiturate. On occasions, the main would see the pink capsules still on the night table when she brought Mrs. Gay's breakfast, and on other mornings no capsules would be left there. None were found in Mrs. Gay's room on the morning of her death, but they were available in the adjacent bathroom.
 
 
 8
 In Alabama the phrase 'solely through external, violent and accidental means' has been construed 'to mean that the accident shall be the proximate cause of death and not exclusive of other conditions, means or circumstances.'[3] An Alabama statute[4] provides that a certified copy of the certificate of death 'shall be prima facie evidence in all courts and places of the facts therein stated'. Another statute[5] requires the certificate to state whether death resulted from disease or from violence 'and if from violence, the means of injury shall be stated, and whether (probably) accidental, suicidal or homicidal.' Construing those statutes, the Alabama Supreme Court has held that a certificate showing death by suicide is prima facie evidence of that cause producing death.[6] The Alabama Supreme Court has further held that,
 
 
 9
 'When death or injury results from taking poison by mistake, the injury or death results from external, violent or accidental means within the terms of a policy of insurance.'[7]
 
 
 10
 Relying upon the foregoing principles of law prevailing in Alabama, the appellant insists that the prima facie presumption created by the certificate of death required the question of whether death was 'effected solely through accidental means' to be submitted to the jury. We do not agree. Under such a policy, the rule prevailing in Alabama is that not only must the result be accidental but the cause or means which produced or brought about the result must also be accidental.[8] Further, the weight of the certificate of death as prima facie evidence may be lessened or eliminated by the testimony of the certifying physician as to the facts upon which the certificate was based, and as to additional facts thereafter disclosed by the autopsy report.[9] With the formal language of the certificate thus explained, there is a complete absence of evidence that Mrs. Gay took either alcohol or barbiturates by mistake. The fatal result may very well have been accidental; that is, in all probability, Mrs. Gay did not intentionally commit suicide. There is, however, no proof that the cause or means which produced or brought about that result was also accidental. Mrs. Gay intentionally drank the alcohol, and if she took the sleep inducing pills at all, there is nothing to indicate that such taking was accidental. If we assume that the combined effect of alcohol and barbiturates would constitute an accidental means,[10] we agree with the district court that the evidence that Mrs. Gay actually took the barbiturates amounted to no more than a scintilla, and was not sufficient to require the issue to be submitted to the jury.[11]
 
 The judgment is therefore
 
 11
 Affirmed.
 
 
 
 [1]
 Mrs. Gay's husband was critically ill in a hospital
 
 
 [2]
 Title 22, § 25, Code of Alabama, 1940
 
 
 [3]
 Benefit Association of Railway Employees v. Armbruster, 217 Ala. 282, 116 So. 164, 166
 
 
 [4]
 Title 22, § 42, Code of Alabama, 1940
 
 
 [5]
 Title 22, § 25, Code of Alabama, 1940
 
 
 [6]
 Sorrow v. Industrial Life & Health Insurance Co., 259 Ala. 544, 68 So.2d 43, 46, 47
 
 
 [7]
 National Life Insurance Co. v. Karasek, 240 Ala. 660, 200 So. 873, 876
 
 
 [8]
 Northam v. Metropolitan Life Ins. Co., 231 Ala. 105, 163 So. 635, 638, 111 A.L.R. 622; White v. New York Life Ins. Co., 5 Cir., 145 F.2d 504, 507
 
 
 [9]
 W.O.W.L. Insurance Soc. v. Phillips, 258 Ala. 562, 63 So.2d 707, 709
 
 
 [10]
 See Morgan v. Indemnity Insurance Co., of North America, 302 N.Y. 435, 99 N.E.2d 228
 
 
 [11]
 See White v. New York Life Insurance Co., 5 Cir., 145 F.2d 504; Reuter v. Eastern Air Lines, 5 Cir., 226 F.2d 443